**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| PAUL DAVIS RESTORATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PIOUS BIRD LLC; JAMES CARRON; JEFFREY CARRON; RECOVER SYSTEMS, INC.; DAVID CARRON; WILLIAM CARRON; NATHAN LEE (a/k/a EDWARD "NATHAN" DANGER); KELSEY TAUGHER; and JOHN GUMAN,<br><br>Defendants. | Civil Action No. [__________]<br><br>COMPLAINT<br><br>(INJUNCTIVE RELIEF SOUGHT) |

Plaintiff Paul Davis Restoration, Inc. ("PDRI") hereby files this Complaint against Defendants Pious Bird LLC ("Pious Bird"), James Carron, Jeffrey Carron, Recover Systems, Inc. ("Recover Systems"), David Carron, William Carron, Nathan Lee, Kelsey Taugher, and John Guman (collectively, "Defendants") and respectfully alleges as follows:

**INTRODUCTION**

1. This case arises from Defendants' efforts to misappropriate PDRI's trade secrets and confidential information in connection with creating a competing business.

2. PDRI provides emergency-response, restoration, and reconstruction services to property owners and to the insurance carriers that pay for most of that work. Over more than sixty years, PDRI has created a proprietary system for managing and providing those services. Because of that system's effectiveness, consistency, and value, PDRI successfully franchised the business. PDRI now has more than 370 franchisees across the United States and Canada. Each franchisee operates under PDRI's methods, programs, standards, and software—as required by the franchise agreements.

3. In August 2024, Defendants James Carron and Jeffrey Carron (respectively, father and son) contracted to open, own, and operate a Paul Davis franchise for Greater Portland, Maine (the "Portland Franchise" and, together with James Carron and Jeffrey Carron, the "Portland Franchise Defendants"). As part of that arrangement, PDRI provided the Portland Franchise Defendants with PDRI's Trade Secrets (defined below) and confidential information. In return, James and Jeffrey Carron promised to "maintain the absolute confidentiality of the Trade Secrets," to refrain from "us[ing] the Trade Secrets in any other business or capacity," and to "immediately notify PDRI in writing of any suspected or actual use of the Trade Secrets by a third party."

4. The Portland Franchise Defendants have broken each of those promises. Using the valuable resources provided by PDRI, they created a competing business called "Recover Systems, Inc." and a competing software platform called "Recover." Worse yet, Jeffrey Carron has admitted that he employed a "Trojan Horse strategy" through which he "bought into the franchise to intimately understand the business" and create his competing software. In other words, Jeffrey Carron planned to misappropriate PDRI's Trade Secrets from the outset—a plan that he and James Carron never disclosed during the vetting and interview process that PDRI requires of every prospective franchisee.

5. Each of the other Defendants played a role as well. Recover Systems built its product on PDRI's materials and deployed it inside PDRI's network. David Carron (Jeffrey Carron's brother) received PDRI's estimating materials, customer files, and portal credentials and used them to build Recover's features. William Carron (Jeffrey Carron's other brother) served as a director of Recover Systems while working at the Portland Franchise with access to PDRI's resources. Kelsey Taugher (a former PDRI employee bound by a confidentiality and non-solicitation agreement) led the solicitation of Recover Systems' customers and investors. And John

Guman (a Portland Franchise employee) ran PDRI program work through Recover, knowing that Recover belonged to Recover Systems rather than PDRI, while PDRI's materials and credentials passed through his hands.

6. In sum, Defendants used PDRI's Trade Secrets, confidential information, and other resources to build a competing product. That conduct is damaging, unlawful, and actionable.

7. PDRI now seeks relief, including a temporary restraining order, a preliminary injunction, and a permanent injunction:

- barring Defendants from using or disclosing PDRI's Trade Secrets and confidential information;
- barring Defendants from deploying or supporting Recover in any Paul Davis franchise office, and from representing that Recover is affiliated with or approved by PDRI;
- requiring Defendants to identify and return PDRI's property; and
- requiring Defendants to preserve and permit forensic imaging of the systems on which Recover was built.

8. To that end—and as elaborated below—PDRI asserts claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"); the Maine Uniform Trade Secrets Act, 10 M.R.S. §§ 1541–1548 ("MUTSA"); the Lanham Act, 15 U.S.C. § 1125(a); and the Maine Uniform Deceptive Trade Practices Act, 10 M.R.S. §§ 1211–1216 ("UDTPA"), and for breach of contract.

## PARTIES

9. Plaintiff Paul Davis Restoration, Inc. is a Florida corporation with its principal place of business in Jacksonville, Florida.

10. Defendant Pious Bird LLC is a Maine limited liability company with its principal place of business in Maine. Pious Bird is a franchisee of PDRI.

11. Defendant James Carron is an individual residing in Maine. He owns 75% of Pious Bird and is a Principal Owner of the Portland Franchise.

12. Defendant Jeffrey Carron is an individual residing in Maine. He owns 25% of Pious Bird and is a Principal Owner of the Portland Franchise. He is a co-founder of Recover Systems and its Chief Executive Officer, President, and a director.

13. Defendant Recover Systems, Inc. is a Delaware corporation with its principal place of business in South Portland, Maine.

14. Defendant David Carron is an individual who, on information and belief, resides in Missouri. He is James Carron's son and Jeffrey Carron's brother. He is a co-founder of Recover Systems and its Chief Product Officer, Vice President, Treasurer, and a director.

15. Defendant William Carron is an individual who, on information and belief, resides in Colorado. He is Jeffrey Carron's brother. He works for the Portland Franchise and is a co-founder, the Chief Technology Officer, and a director of Recover Systems.

16. Defendant Nathan Lee, who, on information and belief, has used the names Edward Danger and Nathan Danger, is an individual who resides outside Maine. He is a co-founder of Recover Systems, its principal software developer, and, according to Recover Systems' investor materials, its Chief Information Officer.

17. Defendant Kelsey Taugher is an individual who, on information and belief, resides in Wisconsin. She is a former PDRI employee and the sales lead of Recover Systems.

18. Defendant John Guman is an individual who, on information and belief, resides in Maine. He is an employee of the Portland Franchise, where he works as an estimator.

19. Pious Bird, James Carron, and Jeffrey Carron are referred to together as the "Portland Franchise Defendants." Recover Systems, David Carron, William Carron, Nathan Lee, and Kelsey Taugher are referred to together as the "Recover Defendants." John Guman is referred to individually.

## JURISDICTION AND VENUE

20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because PDRI asserts claims arising under the DTSA, 18 U.S.C. § 1836, and the Lanham Act, 15 U.S.C. § 1125(a). The Court also has jurisdiction over the Lanham Act claim under 28 U.S.C. § 1338(a) and 15 U.S.C. § 1121(a), and over the DTSA claim under 18 U.S.C. § 1836(c).

21. This Court has supplemental jurisdiction over PDRI's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal claims: the same taking of PDRI's materials, the same deployment of Recover, and the same solicitation of PDRI's franchisees.

22. Maine's long-arm statute, 14 M.R.S. § 704-A, extends personal jurisdiction "to the fullest extent permitted by the due process clause of the United States Constitution, 14th amendment," and reaches any person who transacts business within Maine, does or causes a tortious act to be done within Maine, or does or causes the consequences of a tortious act to occur within Maine. 14 M.R.S. § 704-A(1), (2)(A)–(B). Each Defendant is subject to personal jurisdiction in Maine, as alleged in the following paragraphs.

23. This Court has general personal jurisdiction over Pious Bird because Pious Bird is a Maine limited liability company with its principal place of business in Maine. The Court also has specific personal jurisdiction over Pious Bird under 14 M.R.S. § 704-A(2)(A) and (B). The Franchise Agreement grants Pious Bird a territory consisting entirely of Androscoggin, Cumberland, Oxford, Sagadahoc, and York Counties in Maine, and the breaches and misappropriation alleged in this Complaint were carried out through the Portland Franchise's Maine office, personnel, accounts, and equipment.

24. This Court has personal jurisdiction over James Carron under 14 M.R.S. § 704-A(2)(A) and (B). He is domiciled in Maine. He also operates the Portland Franchise in Maine,

signed and personally guaranteed a Franchise Agreement for a Maine franchise, and received and used PDRI's carrier-portal credentials at the Portland Franchise. PDRI's claims against him arise from that Maine conduct.

25. This Court has personal jurisdiction over Jeffrey Carron under 14 M.R.S. § 704-A(2)(A) and (B). He is domiciled in Maine. He operates the Portland Franchise in Maine. From the Portland Franchise in Maine, moreover, he transmitted PDRI's materials, customer files, and credentials to Recover Systems, ran the Portland Franchise's operations on Recover, and directed Recover Systems' deployment and capital campaign. PDRI's claims against him arise from that Maine conduct.

26. This Court has general personal jurisdiction over Recover Systems because Recover Systems' principal place of business is in South Portland, Maine. The Court also has specific personal jurisdiction over Recover Systems under 14 M.R.S. § 704-A(2)(A) and (B) because Recover Systems developed and tested its infringing product on the Portland Franchise's jobs, data, equipment, and personnel in Maine. PDRI's claims against Recover Systems arise from that Maine conduct.

27. This Court has personal jurisdiction over David Carron under 14 M.R.S. § 704-A(2)(A) and (B). He received PDRI's estimating materials, customer estimate files, and carrier-portal credentials from the Portland Franchise's Maine accounts and used them to build Recover. His Recover Systems account was logged in on the Portland Franchise's workstation in Maine. The consequences of his tortious conduct occurred in Maine, and PDRI's claims against him arise from that conduct.

28. This Court has personal jurisdiction over William Carron under 14 M.R.S. § 704-A(2)(A) and (B). He works for the Portland Franchise in Maine, holds a Paul Davis email account

issued for the Portland Franchise, and used the Portland Franchise's estimating workstation in Maine to send a customer document to David Carron's Recover Systems account. He is also a founder and director of Recover Systems, whose principal place of business is in South Portland, Maine.

29. This Court has personal jurisdiction over Nathan Lee under 14 M.R.S. § 704-A(2)(A) and (B). He used the Portland Franchise's Maine account and vendor subscription to seek developer access for Recover. He received the Portland Franchise's customer estimate files from Maine. And he built and supports an infringing product that runs the Portland Franchise's operations in Maine. The consequences of his tortious conduct occurred in Maine, and PDRI's claims against him arise from that conduct.

30. This Court has personal jurisdiction over Kelsey Taugher under 14 M.R.S. § 704-A(2)(A) and (B). She leads sales for Recover Systems, the infringing defendant that has its principal place of business in Maine. The consequences of her tortious conduct occurred in Maine, and PDRI's claims against her arise from that conduct.

31. This Court has personal jurisdiction over John Guman under 14 M.R.S. § 704-A(2)(A) and (B). He works at the Portland Franchise in Maine, and every act alleged against him occurred there.

32. Exercising jurisdiction over each Defendant in Maine is reasonable. Maine has an interest in adjudicating tortious conduct carried out through a Maine business.

33. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to PDRI's claims occurred in this District and because the property that is the subject of this action, PDRI's materials and the systems on which Recover was built, is located in this District.

## FACTUAL ALLEGATIONS

### A. PDRI Builds a Successful Franchise System for Restoration and Reconstruction Businesses.

34. Over more than sixty years of operations, PDRI has developed a valuable proprietary system for providing emergency-response, restoration, and reconstruction services for residential and commercial properties damaged by water, fire, smoke, storm, mold, and other causes (the "Franchise System").

35. Because of the effectiveness of PDRI's Franchise System and the strength of its brand, PDRI has successfully franchised its business, now with over 370 independently owned franchises throughout the United States and Canada.

36. To maximize business, PDRI maintains regional and national account relationships with insurance carriers and third-party administrators, and those program partners route policyholder claims to Paul Davis franchises. In other words, insurance companies pay PDRI franchises for remediating damage to real estate covered by homeowners or property insurance.

37. Additionally, PDRI has owned the PAUL DAVIS RESTORATION name and mark (the "Paul Davis Mark"), which it has used in interstate commerce since 2002 to identify the Franchise System and the services provided under it. Insurance carriers, third-party administrators, vendors, franchisees, and customers recognize the Paul Davis Mark as identifying PDRI and the services that PDRI sponsors or approves.

38. By becoming a Paul Davis franchisee, a business can borrow or license the Paul Davis Mark; enjoy brand awareness, trust, and credibility; and earn a stream of insurance work generated through PDRI's resources.

## B. Every Paul Davis Franchisee Has Agreed to Operate Under the Same Standards and Requirements.

39. PDRI must ensure that Paul Davis maintains consistent communications, negotiations, agreements, pricing, timing, services, and quality with customers and insurers. PDRI is accountable for the work of every franchisee, and PDRI's brand will be tarnished unless those franchisees operate within PDRI's standards. By ensuring that hundreds of franchisees operate with consistency, PDRI can maintain its brand, guarantee that all Paul Davis businesses provide high-quality services, and generate business with insurance companies. This profitable system then benefits every participating franchise.

40. Of course, a franchisee cannot participate unless it agrees to meet—and does meet on an ongoing basis—PDRI's robust service-level standards and compliance requirements. Accordingly, PDRI's franchise agreements impose requirements for account relationships and for the provision of consistent, high-quality services from each franchisee. The agreements also protect PDRI's Trade Secrets and confidential information. A copy of the Portland Franchise's Franchise Agreement is Exhibit 1.[1]

41. As to account relationships, PDRI maintains sole authority. *See* FA § 1.4 (PDRI "has the sole authority to enter into regional or national account relationships and/or contracts, for and on behalf of the Franchise System, with insurance companies, third party administrators, commercial clients and property managers"). It is "a material breach" for a franchisee to sign or administer a regional or national account without PDRI's written consent. *Id.* Franchisees "must

[1] All citations to exhibits herein refer to the exhibits attached to the Declaration of Andre Krelic in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (the "Krelic Declaration"), filed concurrently with this Complaint. The Franchise Agreement incorporates PDRI's Operations Manual (the "Operations Manual") "by reference into this Agreement," and provides that Franchisee "shall be bound by the terms of the Operations Manual." (FA § 1.2.) References in this Complaint to the "Franchise Agreement" or "FA" are to the Franchise Agreement and the Operations Manual together. The Franchise Agreement is attached as Exhibit 1. The Operations Manual is attached as Exhibit 2.

adhere to the Program requirements of the regional or national account including service levels, compliance and other contractual requirements." *Id.*; *see also* FA § 6.8.

42. When servicing customers, moreover, franchisees must adhere to PDRI's standards and policies. *See* FA §§ 6.5, 6.8; Operations Manual § 3.10.1.10 (each franchisee must operate "in accordance with the standards and policies set forth in the Operations Manual" and must "strictly follow and comply with the procedures, methods, service levels and standards" of PDRI's Program requirements). PDRI's quality-assurance team reviews program estimates and invoices for "Service Level Agreement compliance." FA § 3.16. In the same vein, every franchisee must use a "common software system (the 'Common Software')." That software is "essential to the franchise network." FA § 9.1. Franchisees must also comply with PDRI's written policies, including the information-security and technology policies that PDRI publishes to franchisees through its intranet. *See* FA § 6.8. Those policies prohibit the use or development of software for the Franchise Business without PDRI's approval and require any franchisee proposing to develop software to submit a business case to PDRI and to pass PDRI's security controls.

43. To protect PDRI's intellectual property, every franchisee agrees to use the Trade Secrets only in operating its franchise. *See* FA § 22.3(c) (Franchisee "will not use the Trade Secrets in any other business or capacity" and "will maintain the absolute confidentiality of the Trade Secrets during and after the term of this Agreement"). The same is true of PDRI's methods and systems, which a franchisee may not "reveal . . . to any person, corporation, or other entity unless written permission is given in advance by PDRI." FA § 22.1(g). And every franchisee agrees to use PDRI's name and Marks only "in accordance with this Agreement." FA § 1.3; *see also* FA § 11.4.

44. Ultimately, PDRI owns, controls, and protects the Franchise System—i.e., the systems, methods, procedures, and software that unify all franchises and drive the Paul Davis brand. *See* FA Recitals B, D (PDRI has developed "certain systems, methods, procedures, know-how, computer software programs and other associated trade secrets" for emergency-services, insurance-restoration, and reconstruction work (the "Franchise System"), which the franchisee acknowledges "is unique, novel and valuable"). PDRI selects, licenses, and configures the Common Software for the Franchise System. Its hub is the Restoration Management System ("RMS"), a job-management platform that PDRI licenses from Cotality (formerly CoreLogic) and configures to run PDRI's workflows, compliance tasks, and reporting. Around that hub, PDRI has integrated the estimating platforms that insurance carriers require (including Verisk's Xactimate, the industry-standard estimating tool), PDRI's Validate pre-scrub tool, water-mitigation documentation tools, three-dimensional imaging, and accounting and reporting platforms. The value of the Common Software to the Franchise System lies not in the vendors' code, which PDRI does not claim, but in PDRI's selection and configuration of those platforms, in the workflows and data that run through them, and in the carrier and TPA program relationships that they support. PDRI's Franchise Disclosure Document says the same: "RMS is our job management and Common Software." (2024 Franchise Disclosure Document ("FDD") Item 11.) Ex. 43.

45. In sum, every franchisee must agree to those standards, obligations, and protections before receiving or benefiting from PDRI's Franchise System.

**C. The Portland Franchise Defendants Enter Into the Franchise Agreement and Receive Access to PDRI's Intellectual Property.**

46. On August 16, 2024, the Portland Franchise Defendants entered into a franchise agreement with PDRI (the "Franchise Agreement"). James Carron and Jeffrey Carron both signed,

and their obligations under the Franchise Agreement are "joint and several" with Pious Bird's. (FA, Preamble; § 30.1; Signature Page.)

47. Before entering into the Franchise Agreement, James Carron and Jeffrey Carron went through PDRI's vetting process for prospective franchisees, which included an interview about their intent in owning a Paul Davis franchise. They did not disclose any intent to use the franchise to build competing software.

48. The Franchise Agreement granted the Portland Franchise Defendants a territory consisting of Androscoggin, Cumberland, Oxford, Sagadahoc, and York Counties in Maine for a five-year term ending in 2029. (FA §§ 2.1, 5.1.) In exchange, the Portland Franchise Defendants agreed to protect PDRI's Trade Secrets and to use PDRI's name, Marks, and email addresses only for the Portland Franchise.[2]

49. PDRI imparts its Trade Secrets through training as well as through the Operations Manual and the Common Software. *See* FA § 22.3(b) (PDRI discloses the Trade Secrets "by lending to Franchisee . . . the Operations Manual and other written materials, and the Common Software, all containing the Trade Secrets, through training and assistance provided to Franchisee hereunder"). Every new franchise owner must complete PDRI's Owner's School, which includes classroom, online, and on-the-job training on estimating, job management in the Common Software, PDRI's loss-documentation process, and quality assurance, together with the "PD Way," a series of online courses on how the Paul Davis system and its workflows operate. PDRI then enrolls each new franchise in a three-year Launch program, in which PDRI Launch Coaches work with the franchise on every aspect of its operations. The Portland Franchise remains in that Launch

[2] Through spousal acknowledgments, Mary Theresa McGraw (James Carron's wife) and Madeline Guman (Jeffrey Carron's wife) also agreed to be bound by the Article 22 non-competition and non-disclosure covenants. (FA, Spousal Acknowledgments.)

program today. Its owners attended Owner's School, and PDRI's Year 1 Launch Coach provided the Portland Franchise with PDRI materials, including the "FAST EST sheet" described below.

50. The Franchise Agreement defines "Trade Secrets" as PDRI's:

> secret and confidential information . . . consisting of customer lists; contract forms; appraisal techniques; ideas and data contained in the Common Software and Operations Manual; knowledge of sales and profit performance of PDRI's other franchisees; sources of construction suppliers; methods of selecting subcontractors and other methods, techniques, know-how, formulas and data, now existing or hereinafter developed or acquired relating to the operation and franchising of a Paul Davis Restoration franchise.

FA § 22.3(a); *see also* Operations Manual § 3.1.3.1. The Portland Franchise Defendants further acknowledged "that PDRI is the sole owner of all Trade Secrets; that such information is being imparted to Franchisee only by reason of its special status as a Franchisee of the Paul Davis Restoration franchise; and that the Trade Secrets are not generally known to the trade or public." (FA § 22.3(b).)

51. To protect PDRI's Trade Secrets and confidential information, the Portland Franchise Defendants agreed that they:

- "will use the Trade Secrets in strict accordance with the Operations Manual" (FA § 22.3(c)(i));
- "will not use the Trade Secrets in any other business or capacity" (FA § 22.3(c)(ii));
- "will maintain the absolute confidentiality of the Trade Secrets during and after the term of this Agreement" (FA § 22.3(c)(iii));
- "will not duplicate copy or otherwise reproduce any written materials or computer software containing the Trade Secrets unless it has received prior written consent from PDRI" (FA § 22.3(c)(iv));
- "will observe and implement those procedures established by PDRI and set forth in the Operations Manual to control the use and disclosure of Trade Secrets by employees of Franchisee" (FA § 22.3(c)(v));
- "will immediately notify PDRI in writing of any suspected or actual use of the Trade Secrets by a third party" (FA § 22.3(c)(vi); Operations Manual § 3.1.3.3);

- will "keep all Operations Manual, other written materials and the Common Software containing the Trade Secrets in a secure location," will "maintain control over such materials at all times," and will disclose the Trade Secrets to employees or independent contractors "only to the extent required for such employees or independent contractors to perform their duties of employment" (FA § 22.3(d); Operations Manual § 3.1.3.4);

- will "ensure that Franchisee's principals, employees and members of their immediate families who have access to PDRI's Trade Secrets . . . execute a Confidentiality and Restrictive Covenant Agreement, in the form attached as Exhibit D" (FA § 22.1(h); Operations Manual § 3.5.1.6.1);

- will not, "directly or indirectly," and will ensure that no "member of their immediate family" will, "[e]mploy or otherwise disrupt the employment of any person who is at that time employed by PDRI, PDRI affiliates or any other Franchise System franchisee," or "[d]ivert or attempt to divert any business or customer of the Franchise Business to any competitor, or otherwise harm the goodwill associated with the Marks or the Franchise System" (FA § 22.1(a)); and

- "will at no time, regardless of the terms of this Agreement, reveal any of the methods or systems used by PDRI in its business to any person, corporation, or other entity unless written permission is given in advance by PDRI" (FA § 22.1(g)).

52. Thus, the Portland Franchise Defendants were not free to disseminate the Trade Secrets or to use that property for separate interests.

53. Furthermore, they were not permitted to have any separate business, let alone a competing one. *See* FA § 6.4 ("Franchisee shall not engage in any other business which is not directly related to this Agreement."); FA § 6.5 (Franchisee must "carry on, conduct and operate the Franchise Business on a full-time basis" and must "conduct no business other than the Franchise Business from the Franchise office.").

54. Finally, the Portland Franchise Defendants also agreed to use PDRI's name and Marks only "in accordance with this Agreement," and not to use PDRI's name or Marks "in connection with any electronic commerce or other electronic transmission . . . without the prior written approval of PDRI." (FA §§ 1.3, 11.4.) Pious Bird "irrevocably assign[ed] to PDRI all rights, title and interest that Franchisee may have now or in the future in any internet domain

name/URL, e-mail address . . . that Franchisee establishes or uses in the operation of the Franchise Business." (FA § 11.5; *see also* FA Ex. E.) Therefore, PDRI owns and administers the @pauldavis.com email tenant used by the Portland Franchise's personnel.

55. In sum, the Portland Franchise Defendants received PDRI's Trade Secrets, methods, systems, name, and Marks only after agreeing to robust obligations and protections. The Portland Franchise Defendants even acknowledged that those restrictions "are necessary to protect the legitimate business interests of PDRI, including, but not limited to, its confidential business processes and training provided to Franchisee and Principal Owner, [and] protection of its trade secrets." (FA § 22.1(d).)

**D. After Signing the Franchise Agreement, Jeffrey Carron Uses PDRI's Trade Secrets, Confidential Information, and Other Resources to Create a Competing Company Called Recover Systems.**

56. In 2025—while subject to the Franchise Agreement—Jeffrey Carron founded Recover Systems, a Delaware corporation that develops and sells restoration-management software. While purporting to operate the Portland Franchise, he built Recover Systems into a competing company with officers, engineers, a sales lead, and investors.

57. Jeffrey Carron has since described the Portland Franchise as a means to that end. In a podcast episode published on December 18, 2025—and discovered only recently by PDRI—the podcast discusses how Jeffrey Carron and his two brothers realized the industry's software stack was outdated, so they bought into the franchise to intimately understand the business and build their own software solution called Recover, which they are now scaling to other restoration franchises. The episode outline describes a segment titled "The 'Trojan Horse' Strategy," in which Jeff explains why they intentionally entered the restoration trade as franchisees to identify and solve problems from the inside. Ex. 21. (Catholic Founders Podcast Transcript, Episode 43, December 18, 2025.)

- *Key Moments*

*First time here? Learn more about our mission. And don't forget to subscribe.*

## Today's Topic & Guest:

- Jeff Carron
- Jeff Carron is the owner and operator of the Paul Davis Restoration franchise in Portland, Maine, which he runs with his two brothers. They realized the industry's software stack was outdated, so they bought into the franchise to intimately understand the business and build their own software solution called **Recover**, which they are now scaling to other restoration franchises.

**Hire Talent That Actually Shares Your Mission with Verso Jobs.**
Verso Jobs has built a gamified, data-driven job platform to help you hire people who actually share your mission and values.

Their team understands your needs, goes out to qualified candidates, tests them through the gamified application. Then presents you with candidates who truly share your mission.

If you're a Catholic or conservative organization looking to cut

58. Jeffrey Carron followed through with that illicit plan. He created Recover Systems with his family. He serves as Recover Systems' Chief Executive Officer and President, as well as a director. His brother David Carron is the Chief Product Officer, the Vice President, the Treasurer, and a director. His brother William Carron (an employee of the Portland Franchise) is a co-founder, the Chief Technology Officer, and a director. Kelsey Taugher (a former PDRI employee) is the sales lead.

59. According to Jeffrey Carron's marketing, Recover Systems has developed a software platform called "Recover" for managing restoration businesses. More specifically, Recover purports to be a complete operations platform: a web dashboard for managing jobs, a technician mobile application, artificial-intelligence-assisted estimating, three-dimensional capture, a materials marketplace, and integrations with the Xactimate and Symbility estimating platforms.

60. Those are the functions that PDRI's Common Software performs for every Paul Davis franchise as part of PDRI's Franchise System.

61. For example, the Franchise Agreement requires each franchisee to "transmit (or 'up-load' or 'auto-sync') to PDRI data captured and maintained by the Common Software" and to use the "estimating and other systems" that PDRI designates "as part of the Common Software." FA § 9.1. The Operations Manual requires each franchisee to "timely process all franchise transactions through the Common Software," to obtain "Xactimate estimating software," and to "maintain complete and accurate job files to document all work." Operations Manual §§ 3.6.4.2–3.6.4.3, 3.6.5.1.

62. PDRI teaches those systems as a single, integrated workflow—PDRI's "Lifecycle of a Claim"—that carries every carrier or TPA assignment from intake through inspection, mitigation, estimating, production, invoicing, and close, with required actions, documentation, and deadlines at each stage, all tracked in the Common Software.

63. Additionally, Recover Systems has brazenly marketed Recover as if sanctioned by PDRI: "By next year, Recover will be the default standard for restoration workflows throughout the Paul Davis network and an emerging option in competing Franchise networks." Ex. 42. (recover.systems/investors, captured October 9, 2026):



64. Thus, Recover directly competes with PDRI's Franchise System. In creating and operating Recover Systems and Recover, moreover, Defendants wrongfully utilized PDRI's property.

65. Jeffrey Carron and the other Defendants took PDRI's estimating materials, program-compliance materials, customer claim files, and system credentials from the Portland Franchise and from PDRI's corporate staff. At the same time, they used the Portland Franchise's office, equipment, software subscriptions, email accounts, and personnel to develop and test Recover. Indeed, Jeffrey Carron used his Paul Davis email address to create his account with Recover Systems.

66. PDRI's investigation thus far has revealed the following:

- February 6, 2025: Jeffrey Carron forwarded PDRI's confidential "FAST EST sheet" from his Paul Davis email account to David Carron at david@recover.systems.[3] Ex. 6.

- March 2, 2025: Jeffrey Carron registered an account on the Recover platform using his Paul Davis email address; by that date the platform had login credentials, dashboards, and a function to "Build Reports and Estimates." Ex. 7.

- April 10, 2025: Jeffrey Carron, writing from jeff@recover.systems, sent Portland Franchise job scopes for two Portland Franchise customers to John Guman's Paul Davis mailbox, and from then on ran the Portland Franchise's business through his Recover Systems email account and Recover Systems' business through his Paul Davis email account. Ex. 8; Ex. 9.

- July 11, 2025: Nathan Lee used Jeffrey Carron's Portland Franchise account and an open Matterport support case to seek developer-tool (API/SDK) access for Recover. Ex. 11.

- August 7, 2025: A "Recover Call" was scheduled from a Paul Davis email account, on a Paul Davis Zoom bridge, for August 14, 2025, with four Paul Davis franchise owners, Kelsey Taugher (at her Paul Davis address), Jeffrey Carron, David Carron, William Carron, and Nathan Lee. Ex. 12.

[3] The FAST EST sheet is PDRI's internal estimating toolkit, used by PDRI's central estimating team for program work. PDRI's Year 1 Launch Coach, Billy Spilker, had sent it to Jeffrey Carron and Portland Franchise employee John Guman on January 28, 2025, for use in operating the franchise. Ex. 6.

- August 28, 2025: Jeffrey Carron drew $100,000 on the Portland Franchise's line of credit with Live Oak Bank "for operating expenses" and forwarded the bank's confirmation to jeff@recover.systems. Ex. 13.

- October 29, 2025: Jeffrey Carron, using jeff@recover.systems, gave a "Recover Systems Demo" to a franchise owner on a Paul Davis Teams bridge. Ex. 14.

- November 7 and 12, 2025: Jeffrey Carron circulated an agenda listing "Network Integration" and an "Industry-Wide Advisory Board" and Recover Systems' internal product roadmaps and "Marketplace Competitive Brief." Ex. 15.

- November 19, 2025: Jeffrey Carron sent from his Paul Davis account to his Recover Systems address a draft marketing and sales contract between Recover Systems and a Maine marketing agency that identified the client as "Recover Systems Inc., 60 Gray Rd., Unit D, Falmouth, ME 04105"—the Portland Franchise's office—with "J.Carron@pauldavis.com" as its contact email. Ex. 16.

- December 9, 2025: Kelsey Taugher, writing from kelsey@recover.systems, circulated an "Early Adopter Access to Recover v1.0 Is Ready" document, describing a full operations platform with job management, estimating, a technician mobile application, and a materials marketplace. Ex. 17.

- December 12, 2025: Recover Systems held an "Open Launch Forum" by videoconference, after which Kelsey Taugher promised "roundtable huddles with Paul Davis team members" to "shape the future direction of the product." Ex. 18.

- December 15, 2025: Recover Systems created a production account named "POME," with Jeffrey Carron as administrator, and the Portland Franchise began running its operations on Recover rather than on PDRI's required Common Software. Ex. 19.

- December 15 through 22, 2025: Recover Systems gave early-access walkthroughs to the personnel of another Paul Davis franchise, created Recover accounts for them under a "Paul Davis" organization name using their Paul Davis email addresses as log-ins, emailed them temporary passwords, and distributed a test build of the Recover mobile application; when they requested features, Jeffrey Carron wrote that "Dave and I will make this change over the holiday," and on January 5, 2026, Kelsey Taugher reported that "Dave and Nathan have just about wrapped up all the edits from the first feedback session." Ex. 15; Ex. 22.

- December 17, 2025: After a franchise owner declined to adopt Recover because he could not "wall off a separate PM to work only in Recover" while running PDRI's required system, Jeffrey Carron offered his project manager Recover log-in credentials at "[n]o cost, obviously." Ex. 20.

- December 29, 2025: Kelsey Taugher sent gift cards to two franchise employees for testing Recover, and the same day Jeffrey Carron wrote to a franchise owner that the biggest rollout issue was double entry "while RMS is still required," that "the

bigger concern is whether Shawn and the Paul Davis team will be open to implementation while we're still in this rollout phase and PD is evaluating their options," and that it was "tough to truly test or prove out a replacement when the existing system is still required." Ex. 23; Ex. 24.

- January 4, 2026: Nathan Lee asked PDRI's information-technology department to whitelist the domain noreply@recover.systems, representing that Recover Systems was "working with several of the Paul Davis offices to demo and test our application as part of an ongoing evaluation." Ex. 25.

- January 22, 2026: Jeffrey Carron forwarded the native Xactimate estimate file (.ESX) for a Portland Franchise customer, which contains the complete line-item estimate for the customer's claim, to Nathan Lee at nate@recover.systems. Ex. 35.

- January 27, 2026: Jeffrey Carron, writing from his Paul Davis email address, used Verisk's partner-inquiry form to arrange a February 2, 2026 meeting with the product leadership of Verisk, the maker of the Xactimate software used as part of PDRI's Common Software. Ex. 27.

- February 25, March 10, and March 13, 2026: Jeffrey Carron (from his Paul Davis account) and Kelsey Taugher sent Recover Systems' pre-seed investor deck to Paul Davis franchise owners. The deck stated that the "Paul Davis CTO [is] engaged and supportive of network-wide adoption"; that "[t]wo of Paul Davis's largest revenue-producing offices [are] in active use and committed to championing platform rollout across the network"; that "[n]etwork franchisees are leading the round . . . Pressure applied internally by the network for Franchisor mandate beginning in 2028"; and that Recover Systems targeted a "Paul Davis Cotality contract replacement." Kelsey Taugher told one multi-office franchise owner that "[t]he full raise is for $3M at a $15M post-money valuation" and that "[i]deally we are looking for $100K from each participating office." Ex. 30; Ex. 31; Ex. 32.

- March 19, 2026: Jeffrey Carron wrote from his Paul Davis account to a family of Paul Davis franchisees that Recover Systems would be "formally connecting all of the Recover supporters for something of a round table, so that we can organize our push to distribute the early product across the network, but also lobby corporate in a legitimate sense as a group." The same day, Kelsey Taugher solicited two officers of another Paul Davis franchise, whom she had met at PDRI's Owner's School, to "get involved, whether as an advocate, advisor, or potential business investment." Ex. 33.

- April 15, 2026: Jeffrey Carron forwarded the .ESX customer estimate file to David Carron at david@recover.systems. Ex. 35.

- May 27, 2026: Following a meeting titled "Recover Compliance XX Ashley" that Kelsey Taugher scheduled with David Carron, Nathan Lee, and Jeffrey Carron, Kelsey Taugher received at kelsey@recover.systems three confidential PDRI workbooks containing PDRI's TPA approval criteria and Scorecard 3.0 service-

level guidelines, together with a link to PDRI's restricted service-level-guidelines site, from a quality-performance employee of a Paul Davis franchise who used a Paul Davis email address. Ex. 36.

- June 7, 2026: Jeffrey Carron emailed six Portland Franchise customer estimate PDFs, for claims insured by one of PDRI's program carriers and bearing the customers' names in the file names, to David Carron and Nathan Lee at their Recover Systems addresses. Ex. 37.

- June 15 and 18, 2026: Jeffrey Carron sent Portland Franchise employee Xavier Taylor, at his Paul Davis address, Recover Systems' "Summer 2026 Launch GTM" plan and sales playbook. Part 6 of the plan, titled "The Paul Davis leverage strategy," states: "Recover was built by a Paul Davis franchisee to run his own operation. That insider origin is a non-replicable beachhead — and the strategy turns it into a position where, by the time corporate notices, intervention is their worst option." It directs Recover Systems to "[c]onvert largest franchisees to clients" so that "[a] ban becomes a fight with corporate's own most valuable franchisees," sets a "binding" guardrail to "build defenders FIRST," and instructs that, until roughly thirty Paul Davis offices are on board, Recover Systems should "build the in-network base quietly," because "competitors visibly using Recover is what makes a PD ban unthinkable." The playbook lists as "[r]eference proof points: the paying PD offices and their stories." Ex. 38.

- June 30, 2026: William Carron, writing from will@recover.systems, sent a Portland Franchise customer document to John Guman's Paul Davis mailbox. Ex. 45.

- August 19, 2026: Jeffrey Carron emailed the login credentials for PDRI's MICA carrier portal to Portland Franchise personnel Brandon Castillo, William Carron, John Guman, and James Carron. Ex. 39.

- August 24, 2026: William Carron, writing from the Portland Franchise's Xactimate workstation, told David Carron that he had sent a scanned customer document to David Carron's Recover Systems account because "you were logged into Outlook on that machine." Ex. 40.

- September 14, 2026: Brandon Castillo forwarded the MICA credentials, together with a customer claim document, to David Carron at david@recover.systems. Ex. 39.

- September 18 and 21, 2026: James Carron copied will@recover.systems on his replies to PDRI's FAST estimating team about a Portland Franchise claim. Ex. 41.

67. Defendants knew that those materials—including the TPA approval workbooks, the Scorecard 3.0 workbook, and the AllThingsSLA guidelines—were confidential PDRI property made available to franchise offices solely for program compliance. Nonetheless, Defendants built

Recover using PDRI's Xactimate workstations, Paul Davis email accounts, vendor subscriptions, customer job files, and personnel.

68. John Guman participated with knowledge. He received PDRI's FAST EST sheet from PDRI's Launch Coach on January 28, 2025, together with Jeffrey Carron. From April 2025, he received Portland Franchise job scopes and customer documents from Jeffrey Carron's and William Carron's Recover Systems addresses. He received the login credentials for PDRI's MICA carrier portal on August 19, 2026. And, on information and belief, from December 15, 2025 forward he processed the Portland Franchise's program claims, including PDRI's customer claim files and compliance workflows, through Recover, knowing that Recover was the product of Recover Systems, a separate company, and not a system designated by PDRI. He never notified PDRI. Exs. 6, 8-9, 19, 39.

69. PDRI never gave written permission, or any permission, to disclose its methods, systems, or Trade Secrets to Recover Systems or its developers or to use them to build Recover. No Portland Franchise owner or employee ever notified PDRI that a third party was using the Trade Secrets.

**E. To Conceal Their Wrongdoing, Defendants Made Misrepresentations About Recover to PDRI and PDRI's Franchisees.**

70. To cover his tracks, Jeffrey Carron repeatedly lied about Recover Systems.

71. To PDRI's personnel, he described Recover as a tool built for his office that a handful of offices were testing in beta. To franchisees, he marketed Recover as a replacement for PDRI's required software and, in turn, solicited investments for Recover Systems.

72. On January 4, 2026, for example, Nathan Lee asked PDRI's information-technology department, through PDRI employee Tomi Hooks, to whitelist the email domain noreply@recover.systems so that Recover's account-setup and workflow emails would reach

franchise users. He wrote: "We're currently working with several of the Paul Davis offices to demo and test our application as part of an ongoing evaluation." To Tomi Hooks, it appeared that Nathan Lee was working on a sanctioned PDRI project. In reality, PDRI was not evaluating Recover. Ex. 4. PDRI has never approved Recover for use by any franchisee, and no one at PDRI with authority to do so has endorsed Recover or supported its adoption.

73. To franchisees, Defendants went further. The investor deck that Jeffrey Carron and Kelsey Taugher sent to Paul Davis franchise owners in February and March 2026 stated that the "Paul Davis CTO [is] engaged and supportive of network-wide adoption"; answered the question "What is the Paul Davis relationship?" with "Our CEO is an active franchisee" and "the Paul Davis CTO is engaged and supportive"; and stated that the network was applying "[p]ressure . . . for Franchisor mandate beginning in 2028." Those statements were false. PDRI's Chief Technology Officer, Andre Krelic, was not engaged with Recover Systems, did not support its adoption, and did not learn of Recover until September 2026. No other PDRI officer supported its adoption either. And PDRI has never considered mandating Recover. Ex. 30.

74. The concealment was by design. Recover Systems' "Summer 2026 Launch GTM" plan instructs its team to "build the in-network base quietly" until roughly thirty Paul Davis offices are on board, to "build defenders FIRST," and to reach "a position where, by the time corporate notices, intervention is their worst option." Ex. 38.

75. On September 21, 2026, Jeffrey Carron wrote to PDRI's Chief Technology Officer, Andre Krelic, with an unabashed expectation that PDRI would acknowledge Jeffrey Carron's competing product and his purported ownership of it: "We built our own tool, Recover. We've already partnered with Verisk, so we have no problem on Xactimate claims. Just Claims Connect/Symbility." Of course, PDRI did not authorize the use of its property for the creation of

Recover. On information and belief, Recover Systems obtained Verisk's cooperation by presenting Recover as a project connected to the Paul Davis system. Ex. 4.

76. On September 23, 2026, Jeffrey Carron met with Andre Krelic by video to press for the integration. The meeting was recorded. Ex. 5. Jeffrey Carron confirmed that:

- Recover Systems is "a separate Delaware C corp";
- Recover was built on his family's experience as Paul Davis franchisees;
- Recover was designed to serve as a replacement for PDRI's required software from end to end;
- Paul Davis franchise owners sit on Recover Systems' advisory council; and
- confusion may have arisen because Recover Systems had told others that it owns a Paul Davis franchise.

In other words, he admitted that he intentionally and carefully misappropriated PDRI's proprietary information in order to compete with PDRI and to profit from PDRI's confidential and proprietary information and from the goodwill of the Paul Davis brand. Andre Krelic told him that PDRI's legal department would need to review the request, and PDRI has not approved Recover for any integration.

**F. Defendants Used PDRI's Resources to Solicit Investments for Recover Systems.**

77. Defendants attempted to raise capital for Recover Systems, even though it was built on PDRI's property. To do so, they used a list of 45 Paul Davis franchise offices, PDRI's Owner's School, PDRI's email and videoconference systems, and the Portland Franchise's personnel, and they told franchise owners that PDRI's Chief Technology Officer supported network-wide adoption of Recover. They even asked for "$100K from each participating office" and organized them to "lobby corporate."

78. This illicit investment campaign began as early as February 2026. And the solicitation continues. As of October 9, 2026, Recover Systems' investor webpage solicits a "$3M"

"Pre-Seed SAFE" at a "$15M" valuation cap and states that "[b]y next year, Recover will be the default standard for restoration workflows throughout the Paul Davis network." Ex. 42.

79. That representation is false. PDRI owns the intellectual property on which Recover was built, and Recover Systems has no basis to claim anything about PDRI's intentions. Through those representations, Defendants have presented themselves to franchisees and vendors as though they held the franchisor's authority to develop and designate software for the Paul Davis system—authority that belongs to PDRI alone.

## G. The PDRI Trade Secrets at Issue Derive Their Value From Secrecy, and PDRI Protects Them.

80. The trade secrets at issue in this action (the "PDRI Trade Secrets") fall within the Franchise Agreement's definition of Trade Secrets and include the following categories of confidential information:

(a) *TPA approval criteria.* PDRI's compilations of the eligibility, approval, and documentation requirements for its carrier and third-party-administrator programs.

(b) *Scorecard 3.0 and SLA guidelines.* PDRI's Scorecard 3.0 materials and related service-level guidelines, by which PDRI measures franchise performance on program work.

(c) *FAST estimating materials.* The estimating toolkit of PDRI's central estimating team, including PDRI's scoping tick sheet and its selection and configuration of Xactimate codes and line items for program work. PDRI does not claim the Xactimate software itself.

(d) *Common Software workflows and data.* PDRI's "Lifecycle of a Claim" workflow and PDRI's configuration of the Common Software to run it,

including PDRI's carrier-specific compliance workflows and estimate-review rules, and the job data generated through that workflow. PDRI does not claim the RMS software itself, which it licenses from Cotality.

(e) *Program claim files.* Customer claim files and estimates generated for PDRI program work.

(f) *Program-compliance know-how.* PDRI's documentation, scoping, and estimate-review standards for program work.

81. The Franchise System is the core of what PDRI sells: PDRI licenses the Paul Davis Mark and, with it, provides the support system, workflows, and carrier and TPA program relationships that give Paul Davis franchises their competitive advantage in the restoration industry. The PDRI Trade Secrets are not generally known to the trade or the public and are not readily ascertainable by proper means, as the Portland Franchise Defendants acknowledged. (FA § 22.3(b).) A software vendor or competitor holding them could replicate PDRI's program-compliance methods and estimating standards without PDRI's investment. The PDRI Trade Secrets therefore derive independent economic value from their secrecy.

82. PDRI takes reasonable measures to keep the PDRI Trade Secrets secret. Those measures include the following:

(a) confidentiality and non-use covenants in every franchise agreement (FA § 22.3(c));

(b) the requirement that franchisees keep materials containing Trade Secrets "in a secure location" and disclose them to personnel only as needed (FA § 22.3(d));

(c) lending the Operations Manual and the Common Software only for the franchise term and requiring their return at termination or expiration (FA §§ 1.2, 19.1(d), 19.2(c));

(d) Exhibit D confidentiality agreements for franchise principals, managers, and key employees (FA § 22.1(h)) and non-disclosure agreements for franchise employees (Operations Manual § 3.5.1.6.1);

(e) confidentiality, non-competition, and non-solicitation agreements with PDRI's employees, including the Taugher Agreement;

(f) restricted, credentialed access to the AllThingsSLA SharePoint site, the MICA carrier portal, and the Common Software; and

(g) PDRI's information-security and technology policies, published to franchisees through PDRI's intranet, which govern access to PDRI's systems and prohibit the development or use of software for the Franchise Business without PDRI's approval and security review; confidentiality legends on the Operations Manual; and PDRI's training of franchise owners and personnel on those obligations through Owner's School and the Launch program.

83. Despite those measures, Defendants misused the PDRI Trade Secrets.

## H. Defendants' Conduct Has Harmed PDRI and Will Continue to Harm PDRI Unless Enjoined.

84. PDRI first learned of the nature and scope of Defendants' scheme on or about September 23, 2026. In September 2026, Jeffrey Carron sought access to, and an integration between, Recover and the Cotality platforms that PDRI licenses for the Franchise System. Cotality was suspicious of the request, declined to grant the access, and alerted Andre Krelic, PDRI's Chief

Technology Officer. Andre Krelic requested a call with Jeffrey Carron, which took place on September 23, 2026, as described above. Andre Krelic immediately notified PDRI's Chief Legal Officer, and PDRI began the investigation that uncovered the conduct alleged in this Complaint.

85. Defendants' conduct is ongoing. Recover remains deployed at the Portland Franchise and at other Paul Davis offices—by Jeffrey Carron's account on September 23, 2026, approximately thirty, with almost fifty more waiting—and Recover Systems continues to hold and use PDRI's materials and to solicit business for Recover Systems, to PDRI's detriment.

86. Defendants' conduct has deprived PDRI of control over the PDRI Trade Secrets. It has undermined PDRI's selection of a system-wide software platform. It has placed program work for PDRI's carrier and TPA partners outside the systems through which PDRI monitors and reports compliance, creating double entry and the risk of misreporting to those partners. It has placed policyholders' personal information and carrier claim data in the hands of an unapproved third party, in violation of the master agreements between PDRI and its carrier and TPA partners, and has thereby jeopardized program relationships that are central to the Franchise System. And it has damaged PDRI's goodwill with its franchisees and program partners. That is the result Defendants planned: to entrench Recover in the Paul Davis network so that, "by the time corporate notices, intervention is their worst option."

87. Thus, Defendants are liable to PDRI.

## CLAIMS FOR RELIEF

88. To the extent necessary, pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, PDRI pleads in the alternative and states separate claims it has, regardless of consistency.

**COUNT I**
**Misappropriation of Trade Secrets**
**Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against All Defendants)**

89. PDRI re-alleges and incorporates by reference the allegations in Paragraphs 1 through 88 above.

90. PDRI owns the PDRI Trade Secrets within the meaning of 18 U.S.C. § 1839(4). The Portland Franchise Defendants acknowledged "that PDRI is the sole owner of all Trade Secrets." (FA § 22.3(b).)

91. The PDRI Trade Secrets are trade secrets within the meaning of 18 U.S.C. § 1839(3). They are financial, business, technical, and economic information, including methods, techniques, procedures, and compilations, as alleged in Paragraph 80.

92. PDRI has taken reasonable measures to keep the PDRI Trade Secrets secret, as alleged in Paragraph 82.

93. The PDRI Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from their disclosure or use, as alleged in Paragraph 81.

94. The PDRI Trade Secrets relate to services used in, and intended for use in, interstate commerce. PDRI's Franchise System operates in 45 states and in Canada, and its carrier and TPA program relationships are national.

95. The Portland Franchise Defendants misappropriated the PDRI Trade Secrets within the meaning of 18 U.S.C. § 1839(5)(B). They acquired the PDRI Trade Secrets as PDRI's franchisee and Principal Owners, under a duty to maintain their secrecy and limit their use. (Paragraphs 50 through 52.) Without PDRI's express or implied consent, they disclosed the PDRI

Trade Secrets to Recover Systems and its developers and used the PDRI Trade Secrets to develop, test, deploy, and finance Recover. (Paragraphs 66 and 67.)

96. The Recover Defendants misappropriated the PDRI Trade Secrets within the meaning of 18 U.S.C. § 1839(5)(A) and (B). They acquired the PDRI Trade Secrets knowing, or having reason to know, that the PDRI Trade Secrets were derived from persons who owed PDRI a duty to maintain their secrecy and limit their use, and they used and disclosed the PDRI Trade Secrets without PDRI's consent to develop, test, deploy, and market Recover. Each Recover Defendant knew that the Portland Franchise was a Paul Davis franchise operating under PDRI's franchise system, and the materials identified their PDRI and Paul Davis origin on their face. (Paragraph 66.)

97. John Guman misappropriated the PDRI Trade Secrets within the meaning of 18 U.S.C. § 1839(5)(B)(ii)(III). He used the PDRI Trade Secrets, including PDRI's program claim files and Common Software workflows, in Recover without PDRI's consent, knowing that they had been derived from or through the Portland Franchise Defendants, who owed PDRI a duty to maintain their secrecy and limit their use.

98. Defendants also acquired PDRI's materials and system access by misrepresentation, which is an improper means under 18 U.S.C. § 1839(6)(A). Nathan Lee obtained accommodation from PDRI's information-technology department by describing the deployment as "part of an ongoing evaluation" that did not exist. (Paragraph 72.) David Carron obtained PDRI's moisture-map documentation standard from PDRI's Estimating Team without disclosing that it was for a competing product. (Paragraph 66.)

99. Defendants' misappropriation was willful and malicious. Defendants knew that the Franchise Agreement forbade the use of the Trade Secrets in any other business, concealed the

scope of the deployment from PDRI, and continued to take PDRI's materials and credentials after learning in January 2026 that PDRI was selecting its system-wide software platform through a formal request-for-proposal process. Recover Systems' launch plan called for building its base inside the Paul Davis network "quietly" so that, "by the time corporate notices, intervention is their worst option." (Paragraphs 72 and 74.)

100. As a direct and proximate result of Defendants' misappropriation, PDRI has suffered and will continue to suffer irreparable harm, including the loss of control over the PDRI Trade Secrets, for which there is no adequate remedy at law.

101. PDRI has also suffered actual loss, and Defendants have been unjustly enriched, in amounts to be proven at trial.

102. PDRI is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A); damages for actual loss and unjust enrichment, or a reasonable royalty, under 18 U.S.C. § 1836(b)(3)(B); exemplary damages under 18 U.S.C. § 1836(b)(3)(C); and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## COUNT II
## Misappropriation of Trade Secrets
## Maine Uniform Trade Secrets Act, 10 M.R.S. §§ 1541–1548
## (Against All Defendants)

103. PDRI re-alleges and incorporates by reference the allegations in Paragraphs 1 through 88 above.

104. The PDRI Trade Secrets are trade secrets within the meaning of 10 M.R.S. § 1542(4). They are information, including formulas, patterns, compilations, programs, devices, methods, techniques, and processes, that derive independent economic value from not being generally known to and not being readily ascertainable by proper means by other persons who can

obtain economic value from their disclosure or use, and that are the subject of efforts that are reasonable under the circumstances to maintain their secrecy. (Paragraphs 80 through 82.)

105. Defendants misappropriated the PDRI Trade Secrets within the meaning of 10 M.R.S. § 1542(2), by acquiring them with knowledge or reason to know that they were acquired by improper means or derived from persons who owed PDRI a duty to maintain their secrecy, and by using and disclosing them without PDRI's consent, as alleged in Count I.

106. Defendants' misappropriation was willful and malicious.

107. As a direct and proximate result of Defendants' misappropriation, PDRI has suffered and will continue to suffer irreparable harm, actual loss, and the unjust enrichment of Defendants.

108. PDRI is entitled to injunctive relief under 10 M.R.S. § 1543; damages for actual loss and unjust enrichment, or a reasonable royalty, and exemplary damages under 10 M.R.S. § 1544; and attorneys' fees under 10 M.R.S. § 1545.

**COUNT III**
**Breach of Contract: Article 22 of the Franchise Agreement and the Trade-Secret Provisions of the Operations Manual**
**(Against Pious Bird, James Carron, and Jeffrey Carron)**

109. PDRI re-alleges and incorporates by reference the allegations in Paragraphs 1 through 88 above.

110. The Franchise Agreement is a valid and enforceable contract governed by Florida law. It incorporates the Operations Manual, and it binds Pious Bird and the Principal Owners jointly and severally. (Paragraphs 46 through 55.)

111. The restrictions in Article 22 of the Franchise Agreement are reasonable, are supported by PDRI's legitimate business interests in its trade secrets and confidential business

processes, and are consistent with public policy, as the Portland Franchise Defendants acknowledged. (FA § 22.1(d).)

112. PDRI performed its obligations under the Franchise Agreement.

113. The Portland Franchise Defendants breached Article 22 of the Franchise Agreement and the trade-secret provisions of the Operations Manual in each of the following respects:

(a) They used the Trade Secrets outside "strict accordance with the Operations Manual" and "in any other business or capacity," namely Recover Systems, in breach of FA § 22.3(c)(i)–(ii) and Operations Manual § 3.1.3.3(a)–(b). (Paragraphs 66 and 67.)

(b) They failed to "maintain the absolute confidentiality of the Trade Secrets," in breach of FA § 22.3(c)(iii) and Operations Manual § 3.1.3.3(c). (Paragraph 66.)

(c) They copied and transmitted written materials containing Trade Secrets to Recover Systems without PDRI's prior written consent, in breach of FA § 22.3(c)(iv) and Operations Manual § 3.1.3.3(d). (Paragraph 66.)

(d) They disclosed Trade Secrets to persons who did not need them "to perform their duties of employment," including Recover Systems' founders and developers, and failed to "maintain control" over materials containing Trade Secrets, in breach of FA § 22.3(d) and Operations Manual § 3.1.3.4. (Paragraph 66.)

(e) They failed to "immediately notify PDRI in writing of any suspected or actual use of the Trade Secrets by a third party," a duty they have breached

continuously since February 2025, in breach of FA § 22.3(c)(vi) and Operations Manual § 3.1.3.3(f). (Paragraph 69.)

(f) They revealed PDRI's methods and systems to Recover Systems and its developers without PDRI's advance written permission, in breach of FA § 22.1(g). None of those disclosures was "required to operate the Franchise Business" or to train the Portland Franchise's personnel. (Paragraphs 66 through 69.)

(g) They, directly and through Recover Systems and members of the Principal Owners' immediate family, disrupted the employment of persons employed by other Paul Davis franchisees, including by enlisting franchise personnel to test, develop, and promote Recover, in breach of FA § 22.1(a)(ii). (Paragraph 66.)

(h) They harmed "the goodwill associated with the Marks or the Franchise System," in breach of FA § 22.1(a)(iii), by the conduct alleged in Paragraphs 66 through 78.

114. The Portland Franchise Defendants agreed that use of the Trade Secrets "except as expressly permitted by this Agreement shall constitute an unfair method of competition and that PDRI shall suffer irreparable injury thereby." (FA § 22.3(b).) The breaches alleged in this Count have caused, and unless enjoined will continue to cause, PDRI irreparable harm.

115. As a direct and proximate result of those breaches, PDRI has suffered damages in an amount to be proven at trial.

116. PDRI is entitled to preliminary and permanent injunctive relief under FA § 22.1(f) and to its costs and reasonable attorneys' fees under FA § 22.1(c).

## COUNT IV
**Breach of Contract: Operating Covenants of the Franchise Agreement**
**(Against Pious Bird, James Carron, and Jeffrey Carron)**

117. PDRI re-alleges and incorporates by reference the allegations in Paragraphs 1 through 88 above.

118. The Franchise Agreement is a valid and enforceable contract governed by Florida law. It incorporates the Operations Manual, and it binds Pious Bird and the Principal Owners jointly and severally. (Paragraphs 46 through 55.)

119. PDRI performed its obligations under the Franchise Agreement.

120. The Portland Franchise Defendants breached the Franchise Agreement in each of the following respects:

(a) They engaged in another business, Recover Systems, that is "not directly related to this Agreement," in breach of FA § 6.4 and of Exhibit F's requirement that Pious Bird's "activities must be confined exclusively to operating the Franchise Business." (Paragraphs 56 and 58.)

(b) They conducted Recover Systems' business from the Portland Franchise's office, in breach of FA § 6.5, which requires Franchisee to "conduct no business other than the Franchise Business from the Franchise office," and of Operations Manual § 3.5.1.1.1, which requires that the franchise office "be dedicated solely to the operation of the Paul Davis Restoration franchise." (Paragraphs 66 and 67.)

(c) Since December 15, 2025, they have run the Portland Franchise's operations on a Recover production account as a "replacement" for the required Common Software, rather than "utiliz[ing] the software designated by PDRI," and they have used PDRI's Common Software, data, and

credentials to develop and support Recover, in breach of FA § 9.1. (Paragraph 66.)

(d) Jeffrey Carron used his Paul Davis email account, Paul Davis videoconference bridges, and the Paul Davis name to conduct Recover Systems' business, in breach of FA §§ 1.3 and 11.4, which permit use of the Marks only "in accordance with this Agreement" and forbid use of PDRI's name or Marks "in connection with any electronic commerce or other electronic transmission . . . without the prior written approval of PDRI." (Paragraphs 66 and 77.)

(e) By running program work outside PDRI's required systems, they failed to operate the Franchise Business "in accordance with the standards and policies set forth in the Operations Manual" and to adhere to "the Program requirements of the regional or national account including service levels, compliance and other contractual requirements," in breach of FA §§ 1.4, 6.5, and 6.8 and Operations Manual § 3.10.1.10. (Paragraphs 66 and 86.)

121. As a direct and proximate result of those breaches, PDRI has suffered damages in an amount to be proven at trial and is entitled to injunctive relief requiring compliance with those covenants. The penalties available to PDRI under the Mandatory Operating Requirements are "non-exclusive." (Operations Manual § 3.5.2.4.)

## <u>COUNT V</u>
## Breach of Contract: The Taugher Agreement
## (Against Kelsey Taugher)

122. PDRI re-alleges and incorporates by reference the allegations in Paragraphs 1 through 88 above.

123. PDRI employed Kelsey Taugher from December 20, 2021 until on or about October 15, 2025. On October 13, 2021, as part of her onboarding agreements, she signed an Agreement to Protect Trade Secrets, Covenant Against Unfair Competition, and Non-Disclosure with PDRI (the "Taugher Agreement"), which is governed by Florida law and attached as Exhibit 3. (Ex. 3 § 11.4.)

124. In the Taugher Agreement, Kelsey Taugher agreed "[a]t all times during Employee's employment and thereafter" to "hold in strictest confidence and . . . not disclose, use, or publish any of PDRI's Proprietary Information, except for the purposes of Employee's employment with PDRI" (§ 2.1), and, for eighteen months after her employment ended, not to "solicit, induce or attempt to induce any actual or prospective clients, customers, vendors, franchisees, or insurance companies with whom Employee had direct or indirect contact . . . to terminate, diminish, or materially alter in a manner harmful to PDRI, or its relationship with PDRI" (§ 3.2). "Proprietary Information" includes "ideas and data contained in PDRI's computer software, PDRI's Operations Manual and Procedures Manual" and "information regarding actual or prospective clients, customers, vendors, franchisees, or insurance companies that do business with PDRI, including lists, names, representatives, needs or desires." (§ 11.2.)

125. Kelsey Taugher acknowledged that any violation "will cause immediate and irreparable injury to PDRI" (§ 8.1), and agreed that the prevailing party in any action to enforce the agreement recovers its costs and reasonable attorneys' fees (§ 8.2). Her eighteen-month non-solicitation period runs through March 15, 2027. Every solicitation of a PDRI franchisee alleged in this Complaint occurred within that period.

126. The Taugher Agreement is a valid and enforceable contract governed by Florida law. It is supported by consideration, including Kelsey Taugher's employment, her continued

employment, and the training and access to Proprietary Information that PDRI provided her. PDRI performed its obligations under it.

127. The restrictions in the Taugher Agreement are reasonable in time, area, and line of business, and they protect PDRI's legitimate business interests in its trade secrets, its confidential business information, and its substantial relationships with its franchisees, within the meaning of Fla. Stat. § 542.335.

128. Kelsey Taugher breached the Taugher Agreement in each of the following respects:

(a) She used and disclosed PDRI's Proprietary Information for Recover Systems' benefit, in breach of §§ 2.1 and 2.2, including by receiving and using the 45-office franchise list and PDRI's program-compliance materials. (Paragraphs 66, 67, and 77.)

(b) Within eighteen months after her employment ended, she solicited franchisees whose identities she learned, or with whom she had contact, during her PDRI employment, to adopt Recover in place of PDRI's required systems, to invest in Recover Systems, and to press PDRI to adopt Recover, thereby materially altering their relationships with PDRI in a manner harmful to PDRI, in breach of § 3.2. (Paragraphs 66, 77, and 78.)

(c) During her employment, she participated in activity directly or indirectly competitive with PDRI, in breach of § 5, including by joining the August 14, 2025 "Recover Call" with Paul Davis franchise owners and Recover Systems' founders while still employed by PDRI.

129. Kelsey Taugher agreed that those breaches "will cause immediate and irreparable injury to PDRI" and that PDRI may enforce the Taugher Agreement "by injunction, specific performance or other equitable relief." (Ex. 3 § 8.1.)

130. As a direct and proximate result of those breaches, PDRI has suffered damages in an amount to be proven at trial and is entitled to injunctive relief and, as the prevailing party, to its costs and reasonable attorneys' fees. (Ex. 3 § 8.2.)

**COUNT VI**
**False Association**
**Lanham Act § 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A)**
**(Against Recover Systems, Jeffrey Carron, David Carron, Nathan Lee, and Kelsey Taugher)**

131. PDRI re-alleges and incorporates by reference the allegations in Paragraphs 1 through 88 above.

132. PDRI owns the Paul Davis Mark, which is distinctive and identifies PDRI and the services PDRI sponsors or approves. (Paragraph 37.)

133. PDRI alone decides which software and vendors are designated for, approved for, or integrated with the Paul Davis system. (Paragraphs 41, 42, and 72.)

134. In connection with marketing and providing Recover in interstate commerce, those Defendants used the Paul Davis Mark, PDRI's email domain, PDRI's videoconference bridges, and "Paul Davis" account names, and made false or misleading representations of fact that are likely to cause confusion, mistake, or deception as to Recover Systems' affiliation, connection, or association with PDRI and as to PDRI's sponsorship or approval of Recover, including by the conduct alleged in Paragraphs 63, 66, 72, 73, 75, 76, and 78.

135. Among other things, those Defendants' investor materials, distributed to Paul Davis franchise owners, falsely stated that PDRI's Chief Technology Officer was "engaged and supportive of network-wide adoption" and that the Paul Davis network was applying pressure for

a "Franchisor mandate" of Recover. (Paragraph 73.) And Jeffrey Carron has acknowledged that Recover Systems' statements that it owns a Paul Davis franchise caused confusion about its relationship with PDRI. (Paragraph 76.)

136. PDRI has never approved, sponsored, endorsed, or partnered with Recover Systems, and those Defendants knew it. (Paragraphs 69, 72, and 76.)

137. That conduct is likely to cause, and on information and belief has caused, franchisees, vendors, and investors to believe mistakenly that Recover is affiliated with, sponsored by, or approved by PDRI.

138. Those Defendants acted willfully.

139. PDRI has been and is likely to be damaged by that conduct, including through the loss of control over its reputation and over the software and vendors associated with the Paul Davis system. PDRI is entitled to injunctive relief under 15 U.S.C. § 1116, including the rebuttable presumption of irreparable harm under 15 U.S.C. § 1116(a); to those Defendants' profits, PDRI's damages, and costs under 15 U.S.C. § 1117(a); and, because this is an exceptional case, to its reasonable attorneys' fees.

**COUNT VII**
**Maine Uniform Deceptive Trade Practices Act, 10 M.R.S. §§ 1211–1216**
**(Against Recover Systems, Jeffrey Carron, David Carron, Nathan Lee, and Kelsey Taugher)**

140. PDRI re-alleges and incorporates by reference the allegations in Paragraphs 1 through 88 above.

141. In the course of their business, those Defendants engaged in deceptive trade practices within the meaning of 10 M.R.S. § 1212(1)(B), (C), and (L). By the conduct alleged in Count VI, they caused a likelihood of confusion or misunderstanding as to the "source, sponsorship, approval or certification" of Recover, caused a likelihood of confusion or

misunderstanding as to Recover Systems' "affiliation, connection or association with, or certification by," PDRI, and engaged in other conduct that creates a likelihood of confusion or misunderstanding.

142. Much of that conduct occurred in, or was directed from, Maine, including through the Portland Franchise's office, accounts, and equipment and through Recover Systems' principal place of business in South Portland, Maine. (Paragraphs 66 through 69.)

143. PDRI is likely to be damaged by those practices and is entitled to injunctive relief under 10 M.R.S. § 1213 and, because those Defendants willfully engaged in the practices knowing them to be deceptive, to its costs and reasonable attorneys' fees under 10 M.R.S. § 1213.

**PRAYER FOR RELIEF**

WHEREFORE, PDRI respectfully requests that the Court enter judgment in its favor and against Defendants for the following:

a) A temporary restraining order and preliminary and permanent injunction prohibiting Defendants, and all persons acting in concert or participation with them, from acquiring, using, or disclosing the PDRI Trade Secrets and PDRI's other confidential information, methods, and systems;

b) A temporary restraining order and preliminary and permanent injunction prohibiting Defendants from deploying, supporting, or operating Recover in any Paul Davis franchise office, including the Portland Franchise, and from soliciting any Paul Davis franchisee or franchise employee to use, test, develop, or invest in Recover;

c) A preliminary and permanent injunction prohibiting Defendants from representing, expressly or by implication, that Recover is affiliated with, sponsored by, approved by, or partnered with PDRI, and from using the Paul Davis Mark, Paul Davis email

accounts, Paul Davis videoconference systems, or PDRI's systems in connection with Recover;

d) An order requiring Defendants to identify, return, and segregate all PDRI materials and all data derived from them, including all copies in Recover's code, databases, and documentation, and to certify compliance under oath;

e) An order requiring Defendants to preserve, and to permit forensic imaging of, Recover Systems' and the Portland Franchise's systems, devices, accounts, and code repositories, consistent with PDRI's inspection and copying rights under FA § 6.7(b) and (e);

f) An order granting expedited discovery;

g) A preliminary and permanent injunction requiring the Portland Franchise Defendants to comply with Articles 6, 9, 11, and 22 of the Franchise Agreement, and requiring Kelsey Taugher to comply with the Taugher Agreement;

h) Compensatory damages, including damages for actual loss and unjust enrichment or a reasonable royalty under 18 U.S.C. § 1836(b)(3)(B) and 10 M.R.S. § 1544, and Defendants' profits under 15 U.S.C. § 1117(a), in amounts to be proven at trial;

i) Exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and 10 M.R.S. § 1544(2);

j) Attorneys' fees and costs under 18 U.S.C. § 1836(b)(3)(D), 10 M.R.S. § 1545, 15 U.S.C. § 1117(a), 10 M.R.S. § 1213, FA § 22.1(c), and § 8.2 of the Taugher Agreement;

k) Pre- and post-judgment interest; and

l) All other relief the Court deems just and proper.

Dated: October 14, 2026

Respectfully submitted,

/s/ *John A. Woodcock III*
John A. Woodcock III
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial St.
Portland, ME 04101
Phone: 207-791-1100
Email: jwoodcock@pierceatwood.com

Constantine P. Economides (*pro hac vice* forthcoming)
Casandra Ferrante (*pro hac vice* forthcoming)
DYNAMIS LLP
1 SE 3rd Ave., Suite 1000
Miami, FL 33131
Phone: 305-985-2959
Email: ceconomides@dynamisllp.com
Email: cferrante@dynamisllp.com

*Counsel for Plaintiff Paul Davis Restoration, Inc.*

## CERTIFICATE OF SERVICE

I certify that on October 14, 2026, this document was filed with the Clerk of the Court via MaineECFIntake@med.uscourts.gov, and that a true and correct copy will be sent to each Defendant by email and/or by overnight delivery at the addresses identified below.

*/s/ John A. Woodcock III*

**Defendants:**

**RECOVER SYSTEMS, INC.**

3342 Indiana Avenue
St. Louis, MO 63118

60 Gray Rd.
Unit D
Falmouth, ME 04105

34 Dyer Street
Portland, ME 04106

**PIOUS BIRD LLC**

3340 Indiana Avenue
St. Louis, MO 63118

**JEFFREY CARRON**

jeff@recover.systems
jeff.carron@recover.systems
J.Carron@pauldavis.com
jeff.carron@pauldavis.com

**JAMES CARRON**

jim.carron@pauldavis.com

**DAVID CARRON**

david@recover.systems

**WILLIAM CARRON**

will.carron@pauldavis.com
will@recover.systems

**NATHAN LEE**

nate@recover.systems

**KELSEY TAUGHER**

kelsey@recover.systems

**JOHN GUMAN**

john.guman@pauldavis.com